IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

CPC PATENT TECHNOLOGIES *
PTY LTD. *
* May 31, 2023
VS. *
* CIVIL ACTION NO. 6:21-CV-166
HMD GLOBAL OY *

BEFORE THE HONORABLE ALAN D ALBRIGHT
PRETRIAL CONFERENCE

APPEARANCES:

For the Plaintiff: Darlene Ghavimi, Esq.
K&L Gates
2801 Via Fortuna, Suite 350
Austin, TX 78746

George C. Summerfield, Esq.
Jonah Heemstra, Esq.
Amanda C. Maxfield, Esq.
K&L Gates LLP
70 W. Madison Street, Suite 3300
Chicago, IL 60602

Gregory Tyler Lewis, Esq.
K&L Gates LLP
2801 Via Fortuna, Suite 650
Austin, TX 78746

For the Defendant: David R. Pekarek Krohn, Esq.
Perkins Coie LLP
33 East Main Street, Suite 201
Madison, WI 53703

William J. McCabe, Esq.
Matthew J Moffa, Esq.
Matthew A. Lembo, Esq.
Perkins Coie LLP
1155 Avenue of the Americas
New York, NY 10036

Adam Hester, Esq.
Perkins Coie LLP
3150 Porter Drive
Palo Alto, CA 94304-1212

Janice L. Ta, Esq.
Perkins Coie LLP
500 W 2nd St 1900
Austin, TX 78701

Court Reporter: Kristie M. Davis, CRR, RMR
PO Box 20994
Waco, Texas 76702-0994
(254) 340-6114

Proceedings recorded by mechanical stenography, transcript produced by computer-aided transcription.

09:05 (Hearing begins.)
09:08 DEPUTY CLERK: A civil action in Case 6:21-CV-166, CPC Patent Technologies Pty Ltd. versus HMD Global Oy. Case called for a pretrial conference.
09:09 THE COURT: Announcements from counsel, please.
09:09 MS. GHAVIMI: Good morning, Your Honor. Darlene Ghavimi from K&L Gates for plaintiff CPC, and I'd like to introduce my colleagues today. Mr. George Summerfield, Jonah Heemstra, Amanda Maxfield, Devdhi Kasana and Greg Lewis. And everyone will be arguing at some point.
09:09 THE COURT: Okay. Very good.
09:09 MR. MOFFA: Good morning, Your Honor. Matthew Moffa with Perkins Coie for defendant HMD Global Oy. I'm joined with my colleagues William McCabe.
09:09 MR. MCCABE: Good morning, Your Honor.
09:09 THE COURT: Morning.
09:09 MR. MOFFA: Janice Ta.
MS. TA: Good morning, Your Honor.
09:09 MR. MOFFA: David Pekarek Krohn.
09:09 MR. KROHN: Morning, Your Honor.
09:09 MR. MOFFA: Matthew Lembo.
MR. LEMBO: Morning, Your Honor.

MR. MOFFA: And Adam Hester.

MR. HESTER: Morning.

MR. MOFFA: We'll be sharing argument this morning. And we're also joined by our summer associate, Helena Burns, who I believe you're familiar with and interned with you last summer.

We also have in the courtroom John Kemmerer, who is our damages expert.

THE COURT: Very good.

Okay. I believe the first motion up for me to consider is a Daubert motion. Give me one second.

Okay. I have a motion to exclude the opinions of Chuck Easttom; is that correct?

MR. KROHN: That is one of the motions. I think we had suggested a different sequence, but we're obviously -- Your Honor, that is a motion, but I think --

THE COURT: I'm -- I wasn't mistaken. That's the motion I want to take up.

MR. KROHN: Understood.

THE COURT: I know that may upset your tech people, but...

MR. KROHN: No. It's completely fine. We just wanted to make sure that...

09:11 THE COURT: When I was practicing, we didn't have tech people, so...

09:11 MR. KROHN: Is it -- I'm not seeing it.

09:11 (Off-the-record discussion.)

09:12 MR. KROHN: I can just use the ELMO, if that works for Your Honor.

09:12 MR. MOFFA: Your Honor, while we're arranging the slides, I believe this motion does involve confidential information produced by the parties. Our understanding was that we could ask the Court to seal the courtroom for the presentation of that confidential information.

09:12 Is that acceptable?

09:12 THE COURT: You can. I don't know who the folks are in the back. They may be interns or others. I think they're all interns of the Court's.

09:12 But if anyone's in the courtroom that is not working for the Court or is not under the protective order, you need to step out for this motion.

09:13 I'd like to think that my reputation has grown to where random people just come in and watch, but it's unlikely.

09:13 (Off-the-record discussion.)

09:13 MR. MCCABE: Your Honor, now we have the answer to how many engineers does it take to plug in a

09:13 laptop.

09:13 THE COURT: I'm always suspicious when I have a technical expert who comes up here and can't make anything up here work, but I don't say that in front of the jury.

09:13 (Sealed proceedings.)

09:13 MR. KROHN: So, Your Honor, this is HMD's motion to exclude certain opinions of CPC's technical expert Dr. Easttom.

09:13 Most of what I'll be focusing on today is related to what Easttom refers to as his belt-and-suspenders approach. He defends his opinion by saying it is supported in multiple ways, but as we'll see, it isn't really supported by any reliable analysis. The belt isn't buckled, and the suspenders aren't clipped. So in the end, there's nothing actually holding the pants up.

09:14 As detailed in our briefing, there are three primary issues with Dr. Easttom's opinion in this case which we believe make it so unreliable as to be excluded.

09:14 First, Dr. Easttom relies on a document from a company called [redacted]. But [redacted] software is only used in [redacted], and this document is for a version of the

Android operating system and the hardware sensor that are not used in any accused product.

Second, Dr. Easttom creates sort of a Frankenstein's monster for his infringement analysis. He looks at one accused product for one limitation and a different accused product for a different limitation, never showing how all the limitations are included in a single product.

Third, when the flaws in Dr. Easttom's technical analysis are pointed out, he reverts to saying that he could tell there was infringement simply by using the product. But showing infringement requires more than just showing the devices can be unlocked with a fingerprint or the devices allow multiple users.

Dr. Easttom's assertion that he can determine that all of these limitations are met, including detecting millisecond-level distinctions in timing, is simply unreliable.

For context, Dr. Easttom's opinion is that 19 products infringe the patent. These are listed across the top of this table, and on the left is his division of the claim into limitations.

So we would expect that he would have support to put a checkmark in each of the boxes in this

09:16 table; or as sometimes happens, we would expect to perhaps fill in one full column of this table and then do an analysis of why that product is representative of all other products.

But as we'll see, there are so many holes in Dr. Easttom's analysis that he doesn't show that all the limitations are met for any accused product.

It's important to note that HMD uses original design manufacturers, which are sometimes referred to as ODMs, for the design and manufacture of the accused products. This is something that CPC has been aware of from the beginning of this case.

So those ODMs use different software, different hardware in the accused products. So different ODMs might use different software and different hardware, but, in fact, each ODM may use different hardware and different software even across the products that that particular ODM is responsible for.

So the only way to figure out what is actually in each device is to look at each device. And Dr. Easttom failed to do that.

To help show how these issues make Dr. Easttom's entire analysis unreliable, I want to walk through Dr. Easttom's analysis of a single

09:17 limitation of the claim, and that's what he marks as 1[d], which is: A transmitter subsystem controller configured to match the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute.

09:17 And here you see, basically, Dr. Easttom's entire analysis. And you're not meant to read what is on the screen right now, but we'll walk through each of these pieces and show why none of it actually holds up.

09:17 So again, Dr. Easttom in deposition said several times that he's "sort of a belt-and-suspenders kind of guy." But as we'll see, none of his analysis actually holds up.

09:18 So, first, for Limitation 1[d], Dr. Easttom relies on the FPC Architecture document. Again, this is created by a company called [redacted]. And we can think of this as the belt in Dr. Easttom's belt-and-suspenders approach.

09:18 And you can see here that he says that this document "describes the fingerprint matching portion of an Android device (including the Accused Products)." And then he includes for Figure -- for Limitation 1[d], he includes a few snippets in his report, which you can see on this screen.

But as described in our brief, Dr. Easttom is relying on this document that is for a version of Android that is not used by any accused product, using a hardware sensor for which there's no evidence that that is used in any accused product.

So starting with the Android operating system.

The document specifically says that it is for a version of Android called "Android Release O," which is also known as "Oreo" or "Android 8." And Dr. Easttom acknowledged in deposition that his understanding was that none of the accused products run Android 8.

Similarly, the FPC Architecture document is for a particular hardware sensor made by [redacted] called the [redacted]. And again, there's no evidence that that sensor from that family is used in any accused product.

Finally, even if there was any relevance to this document -- and again, we don't think there would be -- it would only be for any product that uses the [redacted] software. And that is limited to [redacted].

But again, those products don't use the Android 8 operating system and they don't have the

09:20 sensor referred to in this document.

09:20 So the belt in Dr. Easttom's belt-and-suspenders approach is unbuckled.

09:20 Next we'll talk about Dr. Easttom's reliance on source code. He relies on source code in three paragraphs of his report for this limitation.

09:20 And as we said before, we would expect that -- he's accusing 19 products, that he would fill out support for each box in this table. But in some cases, it might be enough to fill out a single column and then analyze whether that product is representative of the other products. But there's three problems with that approach in this case.

09:20 First, remember that HMD uses ODMs for the design and manufacture of the accused product. So 09:21 each accused product may be very different in the software and hardware it uses, making it very difficult to say one is representative of all the others.

09:21 Second, Dr. Easttom never did the analysis of whether there was -- one product was representative of the others, especially in the source code area.

09:21 This actually came up during Dr. Easttom's deposition. Dr. Easttom said he used a comparison tool to compare one file,

[redacted], to -- from one folder for one device to the folders for every other device and said that it was the same.

And I asked him: And so you did that for every file that you requested for printing?

And he said: No. You asked -- in other words, I asked -- about this particular file, [redacted].

I then asked him, well, then how do we know which files he checked from one product to all the other products?

And he said that any place that he says in his report is substantially the same is where he checked it.

And we'll take a look at these particular paragraphs from his report to see if he did that for these paragraphs.

The third issue with having a representative product is that Dr. Easttom never filled out a full column in the matrix we looked at. So in our briefing we put this table of exemplary limitations, and today we're focusing on 1[d], but in our briefing we had five different limitations.

And as you can see across the top, those are all the particular products that he has any support

09:22 for these limitations.

09:22 Again, there's 19 products he's accusing, and he has support for about five of them.

09:22 And so for 1[d] he cites -- in Paragraph 86, 83, 94 he cites particular source code that we'll look at in a minute. And then for 89, he cites for one product, the X100, use of that product as support for this limitation.

09:23 So if we look at our table, first we can sort of take out all of the products that he has no support for, leaving only those four at the top.

09:23 But even for those four, he doesn't have support for every limitation in the claim. And here we're looking just at the five exemplary limitations from our briefing; but of course there are another, you know, half dozen or so that he needs to show support for.

09:23 So looking at the actual paragraphs where he cites source code, we'll start with Paragraph 83. You see that he cites source code from a particular folder, which starts with "bgt."

09:24 HMD uses code names for its devices. Bgt stands for Baby Groot from the Marvel movies. And Baby Groot is the 8.3 5G.

09:24 And you can see nowhere in this paragraph

does Dr. Easttom said, as he said in deposition, he never said that he compared the [redacted] file to every other product. So this paragraph is limited to the 8.3.

Similarly for Paragraph 86, he cites source code that starts with "fpc." FPC is a prefix that [redacted]. And Dr. Easttom acknowledged that in deposition. So this would only apply at most to [redacted].

Finally, in Paragraph 94 he cites source code file called [redacted] from a folder [redacted]. Akt is the G300.

And again, nowhere in here does he say that this file was substantially similar to any other file in any other product.

So if we think of the source code as the suspenders in Dr. Easttom's belt-and-suspenders approach, the suspenders aren't clipped because he's referring only to particular files from particular devices and nowhere does he identify that all the limitations of any accused product are met.

So with the belt unbuckled and the suspenders unclipped, Dr. Easttom resorts to saying he

doesn't actually need the source code. He doesn't actually need the FPC Architecture document because he can tell infringement simply by using the phones.

At points Dr. Easttom may refer to this as "testing" or "experiments," but to be clear, all this involved was a simple use of the phones in an ordinary manner.

For example, in deposition Dr. Easttom said that looking at the source code was simply confirmatory and everything he needed was already in the experiments and the public documentation. It's unclear exactly which public documentation he was talking about, but to the extent he's referring to the FPC Architecture document, that's the unbuckled belt we already talked about.

Later he said: The experiments and documentation were sufficient to show the claim limitations.

And although Dr. Easttom admitted that there would be different ways to code the software that would achieve the same goal, he said this is a case where he didn't have to do that, that he could honestly have written the whole report and never looked at source code.

But the claim at issue has a number of

very technical limitations. It requires a database of biometric signatures. It requires a transmitter subsystem and a receiver subsystem. The transmitter subsystem has to have a transmitter subsystem controller that outputs an accessibility attribute. It also has to have a transmitter configured to emit a secure access signal. It has to map a series of entries of the biometric signal to an instruction to populate the database according to the instruction.

None of these are things that you can determine simply by using the accused products.

So let's look at 1[d], which requires that a transmitter subsystem controller is configured to output an accessibility attribute. Again, that's not something that you can tell simply by using the product.

And it's nothing that is shown in the snippets of screenshots that Dr. Easttom put in his report.

All he did was add another user showing that the device is capable of multiple users. Nowhere does that show that there is a transmitter subsystem controller or that there is outputting of an accessibility attribute or anything like that.

When -- at deposition, Dr. Easttom was

given a hypothetical system and explained how that hypothetical system would work and asked whether that hypothetical system, from the user's standpoint, would practice the claims and practice a particular claim limitation, he said he'd "have to look under the hood to see what's happening."

And by "under the hood," he meant looking at the actual code because there are different ways that something could be implemented. And some ways would infringe and others would not.

But for the accused products, he doesn't look under the hood. He says that he could determine it simply from experiments. In fact, for one limitation, he said that he could tell the limitation was met simply from using the devices because he could tell millisecond differences in how the devices operated and that would determine that there was infringement.

Now, a bee beats its wings at 230 beats per second. That's about 4 milliseconds per wing flap. So that gives you a sense of how quickly Dr. Easttom would have to be able to evaluate two or three or ten phones and compare them to figure out whether this limitation was met. And it's simply -- it's unreliable and it's simply impossible.

So simple use cannot show that this limitation is met.

So we've now looked at Dr. Easttom's entire analysis for Limitation 1[d]. And we've shown that the belt isn't buckled, the suspenders are unclipped, and there's nothing holding up Dr. Easttom's analysis.

But Dr. Easttom makes another error that also requires his opinion to be excluded, and that's improper claim construction.

So Dr. Easttom relied on claim constructions that were never issued in this case. Those are biometric signal, database, and conditional access.

And I want to focus on biometric signal today.

He believed that the Court had issued a construction that biometric signal was: The physical attribute of the user (i.e., fingerprint, facial pattern, iris, retina, voice, etc.).

The Court has never issued that construction. The parties have never agreed on that construction in this case.

In deposition Dr. Easttom admitted when he was asked about biometric signal that there are

multiple ways that that term could be interpreted. He said: Are we talking about the signal that comes from the sensor to an interpreter, or are we talking about the signal that comes from the interpreter to somewhere else?

And so he had multiple ways that he thought that that term could be considered and what a person of ordinary skill would consider that term to be.

And one of his views, the signal coming from the sensor, is actually in line with Dr. Daft's opinion that the plain and ordinary meaning of the term to a person of ordinary skill in the art would be a signal that represents information contained in the physical attribute or biological feature.

But Dr. Easttom doesn't consider whether that's what the term might mean. He doesn't consider infringement under that view. He simply jumps right to what he believes incorrectly the Court had already issued in this case.

Now, CPC improperly frames this issue as HMD raising a claim construction dispute. And that's not the case. The claim construction has occurred. This term was never construed.

The issue is that CPC's expert,

09:32 Dr. Easttom, is using a construction never issued by this Court. And he's relying on that for his infringement opinion.

09:32 CPC also says that there's no distinction that makes any difference between the biometric signal being the fingerprint itself or information contained in the fingerprint, but here's why it matters.

09:33 The claim requires a biometric sensor configured to receive a biometric signal. And that's the antecedent basis for receiving a series of the biometric signal.

09:33 Now again, it's not a series of biometric signals, it's a series of entries of the biometric signal. So if the biometric signal is the fingerprint itself, then the issue is whether the multiple presses of different parts of your finger are a series of entries of the biometric signal.

09:33 If the biometric signal is this digital signal coming out of the sensor, then the issue is whether that digital signal is the same with every press. And inevitably it won't be, because of the way that these sensors work.

09:33 Finally, and very quickly, separate from his infringement analysis, Dr. Easttom compares two patent licenses or compares two patents to say that

they're technologically comparable to the '705 patent. But his opinions, in that case, are simply conclusory.

He just says that -- for one from the company called ID Tech, he says that the '552 patent is within the biometric authentication field, and then just has the conclusion that it's technologically similar.

Most of this paragraph is actually explaining why the '552 patent and the '705 patent are different. And he never actually has any analysis for why they would be the same.

And, similarly, for the Smart Metrics patent he does the same thing. He says that they're the same because they're on the same biometric authentication field but never explains why they're technologically comparable.

So unless the Court has any questions, I'll turn it over to CPC.

THE COURT: I'm good. Thank you.

MS. GHAVIMI: Your Honor, Darlene Ghavimi. Good morning.

I think the biggest question CPC has is, why is this a Daubert motion? Everything they're arguing about is sufficiency of the evidence or appropriate claim construction.

09:35 You know, a Daubert is meant to exclude unreliable and invalid methodology.

09:36 THE COURT: Hold on one second.

09:36 (Off-the-record bench conference.)

09:36 THE COURT: Well, what I was hoping to hear a little bit more of -- and I didn't in the opening argument -- was your expert's reliance on the FPC document, and I think that would be Daubert. I also think, you know, "tomato," "tomato" -- I don't know how Kristie takes that down -- but, you know, if we're arguing over whether the methodology is wrong because there are, was it 25, whatever number of products, and he only did the -- every element for four of them and the others don't, is that method or is that summary judgment? I'm happy -- and there's a summary judgment, I'm happy to take it up that way too.

09:37 I can tell you that I granted a directed verdict in a case where, when the plaintiff finished, the defendant got up and said, Judge, they didn't put on elements -- these elements. And I don't want to go through trial to do that. I'm going to do that today if I need to.

09:37 And so I'm happy -- I'd rather not quibble over whether it's a Daubert or a motion for summary judgment. As I see it, the issue your expert

has is over, first, whether or not the applicability of the FPC document was appropriate and then the omission of the proof of elements for each of the products.

I'm also concerned at what I understand his methodology to be, where he didn't have the source code for all of them, he simply said, I have the source code for some and I'm going to say that that's sufficient for the others because I'm an expert.

I think that's Daubert.

So -- but there's no question there are issues with your expert's opinions in this case. And so however you want to approach that, you can, but I'm pretty up to speed on the problems.

MS. GHAVIMI: Thank you, Your Honor.

And a lot of what I'm going to argue overlaps with the motion for summary judgment that HMD has.

THE COURT: And let me ask this: Would it make more sense -- would the defendant like to put on their motion for summary judgment also and then I can hear from them at once, or do you -- would you like to hear from her --

MR. KROHN: We have someone else who's arguing the --

THE COURT: I don't care about that. I'd

09:39 just like to know: Would it make more sense to hear first from your person, or would it make sense to let her finish and then do it as rebuttal?

I don't care how we do it. I mean, it's going to be the same mix.

MR. KROHN: I think that we feel the issues are actually somewhat different between our Daubert and our motion for summary judgment. The result might be the same if the case goes away, but we think they're not as overlapping as CPC seems to believe it is.

THE COURT: Okay. I'm going to take that that you'd like to have her go next. So let's do that.

MR. KROHN: Thank you.

MS. GHAVIMI: So, Your Honor, I think there's a very easy answer to the questions -- issues you just identified.

Dr. Easttom compared the different forms of evidence that he had, source code documents, his testing, and he found that they all were consistent with what he originally looked at, the Android open source code.

At the very beginning of the case, HMD said, go look at the source code, the Android code. That is where you should go to evaluate the products

09:40 for whether they infringe or not.

09:40 Can you go to the next slide?

09:40 Okay. Dr. Easttom found that this Android open source code demonstrates infringement for all of the phones. And one reason supporting that is that HMD has admitted that every single phone operates on an Android system.

09:40 Now, there are different Android operating systems that the phones use. Dr. Easttom went through each version of Android and determined that for fingerprint authentication functionality, there is no difference between Android version. No difference.

09:41 So looking at a product with Android 9, looking at a product with Android 10 or 11 or 12, the fingerprint authentication is going to operate the same.

09:41 He looked at all of the source -- so that addresses products that HMD provided source code in this case and products where they did not provide source code to us in this case.

09:41 And you can -- you can see at Paragraphs 41 and 42 Dr. Easttom's opinion about the Android open source code.

09:41 Then what did he do to show -- to support

his opinion that that proved infringement of the products?

He went through every single code folder of the products that HMD produced and found the same files in each. He found [redacted]. That is the -- that is the overall code that operates the biometrics functionality in the Android operating system.

And many of the citations --

THE COURT: Let's take a step back.

What I hear you saying is that if you prove it for one version, then all the other Android versions are the same. That's what I heard you say, correct?

MS. GHAVIMI: Yes.

THE COURT: What -- where does your expert establish that in his report?

MS. GHAVIMI: I believe it's 40.

THE COURT: If you'll bring up his report where he says, I'm going to analyze one, and if I analyze one, that's sufficient for all versions because, with regard to the accused functionality, they're all identical. And here is my opinion -- what my opinion is based on that they're identical.

That's what I'd like to see.

09:43 MS. GHAVIMI: I apologize. I don't have his report to bring up, but I can read it to you. And he doesn't say it as eloquently as you did, Your Honor.

09:43 He says: In general, the earliest iteration of the Android platform using the accused products is Version 9, while the latest is Version 12. For purposes of the opinions expressed herein, it is immaterial which of the Android platform versions is being used as the functionality providing the interface with the fingerprint recognition platform has not changed.

09:43 THE COURT: That's it?

09:43 MS. GHAVIMI: Then he goes on to say he found the source code folders for this Android open source in each of the folders that he examined, and he says he examined every single folder. He did not print files from every single folder because that would have been hundreds of thousands of documents.

09:44 THE COURT: Okay.

09:44 MS. GHAVIMI: So what -- I'd like to look at also, you know, put more context on this.

09:44 HMD talks a lot about what Dr. Easttom did not do, but I want to talk about what he did do.

09:44 As I just mentioned, he talked -- he looked at the Android code. He evaluated the Android

code in all of the accused products, and he found evidence of infringement.

So as I said before, you know, it doesn't matter the version of code. He could have stopped there, but he went further to support his opinions.

And the next slide.

This is just an example of all of the different evidence he used to support his opinion that -- this is an example of one claim limitation -- that each claim limitation is met.

And when he identifies that one claim limitation is met because the functionality's the same across all of the Android versions, this applies to all of the products.

Now, he had to take pieces of evidence -- because we didn't have source code for all of the products, which HMD at first said they don't have and then towards the end of discovery somehow produced to us, he had to rely on documents that HMD produced, his understanding of how this -- how the fingerprint authentication process works in the field and then he cited source code.

And one thing I'd like to mention is that source code that HMD produced contained Android open source code and the specific FPC source code that is

09:46 specific to the [redacted] software.

09:46 Dr. Easttom did not rely on the FPC source code alone to establish infringement. First, he -- so let me go through this.

09:46 He relied on the 30(b)(6) testimony of HMD, that the functionality is the same in the accused products, doesn't matter the Android platform.

09:46 The FPC document, let me address that.

09:46 As I said earlier, HMD claims that it's directed to Android 8. Well, as we've already said, that doesn't matter.

09:46 What else did Dr. Easttom do?

09:46 He compared the flow of the process, how the software works with the architecture in the Android code to the actual code that was produced for the products. He found that they were the same. That confirmed his understanding -- well, actually, I'm sorry.

09:47 What that did for him was say, this is a document where I can show this diagram because it represents it is the same as what's actually going on in the code. He doesn't rely on this document for anything more than that.

09:47 And what he then did was compare what was going on -- the flow going on in the FPC document to

09:47 two things: First, and I think I probably just said this, what's happening in the code that was provided from [redacted]; but then he also compared it to what was happening in the code for products that do not have [redacted] software. And they work the same.

09:47 So the software provider, the sensor hardware makes no difference. The fact that he cited [redacted] software for certain products is just one piece of the evidence he used. He also cited open source code for another product to show that this claim limitation was met.

09:48 Then what did he do? What about all the products where he didn't have source code?

09:48 Well, he already reviewed the Android source code first. So the fact that he -- you know, to say he didn't have source code is not accurate.

09:48 Then what did he do?

09:48 He went through the fingerprint authentication enrollment process on each phone, and he determined that they all worked the same.

09:48 So that's just confirming his understanding that the Android open source code proves infringement even of the products HMD did not provide source code for.

And I'd like to say that --

THE COURT: Where are the product tests in his report?

MS. GHAVIMI: He talks about the tests he did as he goes through each claim limitation. He didn't cite these tests to support some of the limitations unlike what --

THE COURT: Give me an example of anywhere in his report he talks about performing the fingerprint authentication enrollment and an unlock test for those 14 models. I have his report up on my computer.

MS. GHAVIMI: So he identifies in the beginning the models that he tested. Let me see. I apologize. 23, Paragraph 23.

THE COURT: Okay.

MS. GHAVIMI: Then Paragraph 47: I confirmed the presence of fingerprint recognition.

So this is the preamble. This is a system -- let me see where it is. Sorry.

A system for providing secure access to a controlled item, the system comprising...

So he's -- first cites all of this other evidence and then at the end says: I confirmed the presence of fingerprint recognition to unlock a device

through my own experiments with the above identified models.

And then it goes on, and he gives screenshots of the process that he went through. And he has -- he videotaped these as well. So that's 48, 49, 50, 51, 52.

And then he goes on, 53, to cite Android open source code that is present in this phone that shows -- that confirms the process he just went through.

Would you like me to --

THE COURT: What I'm not following is in Paragraph 47 with regard to which products?

MS. GHAVIMI: With regard to which product?

THE COURT: Uh-huh.

MS. GHAVIMI: He did this for all of the ones that are identified in 20...

THE COURT: Paragraph 47 says: I confirmed the presence of fingerprint recognition unlocked a device from my own experiments with the above identified models of the accused products.

Which ones are those?

MS. GHAVIMI: The list in 23. 1.4, 3.2, 4.2, 5.4, 6.2, 7.1, 7.2, 8.3, C5 Endi, G10, G20, G300,

X100, and XR20.

THE COURT: Okay.

MS. GHAVIMI: I mean, Dr. Easttom did not need to do these tests because he had already had sufficient evidence of infringement from the Android source code.

Everything else that HMD points to as saying, well, he only put this evidence for this claim limitation for this product. That's not what he did. He first established that the evidence he's citing applies to all of the products and that differences that HMD points out are irrelevant because it functions in the same way.

I'm going to -- just like to point out that in Paragraph 83, which my colleague had up on the screen, he cites Android open source code as part of his evidence. He does that at 83, 84, 85. He points to [redacted]. That's Android open source code.

It's a standardized code that, as he expected and confirmed, does not operate in very different ways across the versions.

THE COURT: So let me -- here's the problem I'm having. What I'm -- when I try and evaluate whether there's sufficient information in the

report or not, I do -- it's two things.

One, I anticipate on direct you'll have him or her, but the expert say what they say. And it should not come as a surprise to the other side because they have seen it in the report. That's one component.

The other is how the person who's tasked with cross-examining the witness can tie him down as to how he performed his methodology here.

For example, how -- how in this case does the defendant cross this expert on his methodology to confirm all products operate the same if his response is what we have in this report, which is virtually none, other than I'm an expert and I did it. That's -- that to me is sort of what Daubert's about.

What methodology did he use that he articulated -- not -- what methodology did he use to confirm all products operate the same that's in the report? I want you to show me the page of the report where he says what that is in a way that the defendant -- if I was on the defense side, I could cross-examine him on it.

MS. GHAVIMI: So I understand that his report is presented in a somewhat unusual way, but he does this every time. He compares the various pieces of evidence. He --

09:54 THE COURT: Show me -- anywhere in the report. I want to see because if they stand up and say it's not in his report, you're going to have to say it is because you're going to have the page there where it is in his report. So I want you to show me in the report where he discloses his methodology for making and for providing that expert opinion.

09:55 MS. GHAVIMI: Well, in 40 and 41 and 42 he talks about how he --

09:55 THE COURT: Okay. Hold on one second.

09:55 Okay. I've read that.

09:55 MS. GHAVIMI: That's versions of Android and the Android open source code that's present that he reviewed in each folder and found there.

09:55 I mean, Dr. Easttom has been reviewing source code for 30 years. When he reviews -- and he will testify at trial -- when he looks at code, he can review it and determine that the flow -- if the presence of these files in this product, they're also present in the files for this product and they flow in the same way, he can -- that's his -- he can understand, based on his experience and expertise, that they are going to operate the same.

09:56 The other --

09:56 THE COURT: What methodology -- what

evidence is his methodology based on?

MS. GHAVIMI: There's the same code that operates --

THE COURT: And it's revealed in the report.

MS. GHAVIMI: His methodology is that -- there's the same file in each folder and there's the same file in Android open source code that is present in each product.

I mean, that's a very simple methodology. His -- then he determines that these various pieces of code perform the actions that meet the claim limitations.

It's just like no different than if every single piece of product had a particular chip in the same model, you -- an expert should not have to go and break down each model and look at the same chip each time and check off a box in a big matrix because that chip is the same. That's essentially what he did here.

The rest of the evidence he used to support that opinion. And he goes through and describes his methodology when he talks about each claim limitation. He talks about how he looked at -- 43. The file [redacted] operates, has authentication to authenticate. It has -- it

authorizes users to have access to the accused product. And he says, See also the FPC Architecture document.

He confirms that documents produced by HMD are consistent with the files that he found and the way the source code operates.

And he does that with Paragraph 44 and then he goes back to 45. It's part of the Android system, which is standardized.

Going back to he compared how the code flows and how the -- how the code functions in each Android operating system. And for fingerprint -- for fingerprint authentication, it's no different. Citing to one file is -- that is present in every single folder, that's his methodology.

(Off-the-record bench conference.)

THE COURT: Okay. You may continue, please.

MS. GHAVIMI: I realize I didn't address your question about cross-examination.

HMD can easily cross-examine Dr. Easttom by putting up Version 8, Version 9, Version 10 of the code and saying, well, why do you think this doesn't operate in the same way?

And HMD's expert, Dr. Daft, disputed that they operate in the same way. So presumably CPC has

the opportunity to cross-examine him as to why he thinks that based on his understanding of one of ordinary skill in the art.

THE COURT: If they asked your expert, Mr. Easttom, to point out in his report that question, where would he say?

MS. GHAVIMI: He would go through -- he would go through each limitation and cite where he's found the code. He would -- he would talk about in the beginning, 41 and 42 and 40, where he says they operate no differently.

And then he would go through each claim limitation in his report to say how the Android open source code performs the functions that meet the claims.

And he would say that the way the code says it goes, the way Android open source code says that the process works is consistent with all of this other data; and, therefore, that confirmed my opinion.

And they -- and HMD can cross him and say, well, why do you think this particular file, when it's meant -- when it's from one particular product, applies to other products? And then he will explain that he has found there's no difference in the functionality.

THE COURT: Okay.

MS. GHAVIMI: I'd like to address the claim construction arguments.

We agree that Dr. Easttom misstated in his report that this Court has construed certain claim limitations.

But as HMD agrees, Dr. Easttom can testify at trial about whether and how the claim limitation -- an accused product meets a claim limitation. That's all he's going to do.

He's not going to offer claim construction arguments. He's not going to provide anything else other than his expert opinion as to why an accused product meets the claim limitation.

And I can give you an example -- he did that in his report. So if you look at biometric signal, Paragraph 78, what HMD did not point out, he says, "biometric sensors configured to receive a biometric signal (fingerprint)."

Fingerprint is a biometric signal. That's what he's going to testify to.

Now, HMD can cross him with their expert believes differently. And they can ask him why he thinks that, and they can cite to his deposition testimony. But that's fodder for cross-examination.

That's not an unreliable methodology.

And the other limitation HMD addresses and argues is it's simply a dispute about what the plain and ordinary meaning is, which their expert has one interpretation and Dr. Easttom has a different opinion as to why infringement is present.

And HMD is just trying to raise a claim construction argument -- reargue claim construction in the context of a Daubert.

And I'm going to rest on the briefings on the technological comparability unless Your Honor has any questions.

THE COURT: Any response?

MR. KROHN: Yes, sir.

So starting with the claim construction issue. The problem is his report doesn't do any analysis for why the fingerprint would be a biometric signal. And so I don't know how he can testify about how he came up with that. It's not in his report.

But going back to the primary issue. What I heard Ms. Ghavimi say was basically reiterating the belt-and-suspenders approach that Dr. Easttom used.

And the problem -- you talked about cross-examination. The issue is, as he did in deposition, we expect that when Dr. Easttom is

challenged on the technical analysis he did, questioned about the source code, questioned about these technical documents, he'll revert to say, well, I didn't actually need any of that. I just used the phones and that was enough.

And that's where our cross-examination kind of has to stop because he'll just say, as Your Honor pointed out, I'm an expert. Trust me. This is how it works.

CPC's counsel pointed to I think three particular paragraphs in Dr. Easttom's report. Those deal with very specific files. So one was [redacted]. That's the one file in deposition that Dr. Easttom said he actually did compare across products.

The other, she pointed to I think Paragraph 45 or 43 -- I'm sorry -- which is for a particular product. And that's a different file. I think that was [redacted]. Nowhere in there does he say he compared that one to any other accused product.

And Your Honor, I think, started by saying that what does his methodology show that, given every element of one product is met, it's representative of all other products?

10:07 The point that I was trying to make is he hasn't even shown that any one product, that all the limitations are met. And so he can't then do the second step to say it's representative of all the other products.

10:08 And then I think finally, unless there's any other questions from the Court, I want to be clear that -- about the source code.

10:08 HMD produced all the source code it had. It let Dr. Easttom review it whenever he wanted to. There was no restriction put on how much he could print.

10:08 If infringement is shown as, I think, CPC's counsel said, from one file, [redacted], he could have printed 19 or however many copies of that one file. That wouldn't have been difficult. That wouldn't have been the hundreds of thousands of files that she referred to.

10:08 The other point I wanted to make, CPC talked about Android operating open source code. To be clear, the source code that I believe she's referring to is within what HMD produced.

10:09 I don't believe that there is an exhibit or any reference in Dr. Easttom's report to other sort of standard Android operating system code that he

looked at beyond what was produced by HMD.

So his reliance on, oh, I looked at the operating system, the Android operating system, and I can tell that it's all the same. I'm not sure where that comes from other than looking at the HMD produced code.

And unless there's any other questions from the bench, we'll rest.

THE COURT: Anything else?

MS. GHAVIMI: Yes. Just quickly.

Dr. Easttom did say in his report that he reviewed publicly available Android open source code, and the [redacted] and [redacted] files are standard. Those are standard elements of the Android open source code for fingerprint functionality.

They are not -- the fact that -- he didn't need to print a page of source code for every single product to demonstrate that the Android open source code [redacted] -- I mean, [redacted] and [redacted] are present because they admitted that every single product used Android open source code.

Thank you.

MR. KROHN: Just to make one quick point, which is: CPC's counsel's been referring a lot to

[redacted] and [redacted]. Again, [redacted] is the one file that he said he did compare.

I don't think that Dr. Easttom's report shows that -- any limitations and definitely not all limitations are met by that one file, as CPC's counsel seems to be saying today.

Similarly, for [redacted], he actually didn't say that he reviewed that for all the other products. And again, I think he refers to that for one particular limitation.

THE COURT: Okay. Why don't we take up the summary judgment issue next?

MR. LEMBO: Your Honor, my name is Matthew Lembo, and I'm here representing HMD Global Oy.

In its opening brief, HMD moved for summary judgment of noninfringement on three bases. Unless the Court has any specific questions, I'll briefly summarize the first two bases, but I don't plan to argue them today. And they may -- they may be decided on the papers.

First, HMD moves for partial summary judgment for all but three of the accused products because for the claim element directed to a memory comprising a database of biometric signatures, CPC

identifies evidence that applies to just three of the accused products. And this somewhat relates to the Daubert that was just argued.

But CPC identifies no evidence of a database for the remaining products, and CPC or its expert Dr. Easttom never alleged that any of the three products for which it provides evidence is representative of all other products.

HMD also moves for a complete summary judgment because CPC fails to show that a transmitter -- fails to show a transmitter that emits a secure access signal to a receiver. Instead, CPC points to a single central processor that serves as both the transmitter and receiver with signals operating on that processor and says that is the claimed emission.

Now, finally, HMD moves for a complete summary judgment because CPC fails to show that any accused product receives a series of entries where the series is characterized by both the number of entries and durations of each entry.

This is the limitation I plan to focus on today. And CPC, for background, contends that this limitation in particular is directed to an enrollment process.

Setting -- and the enrollment process typically involves setting up a device where you touch your finger to a sensor multiple times. And CPC points to HMD's enrollment process as the infringing feature for this limitation.

CPC's infringement theory, however, is predicated on an impermissible rewriting of the plain words of this claim.

To kind of jump to the specification first, the specification does not support CPC's infringement theory at all. The specification describes how an administrator of a system can convey to the system by providing a succession of finger presses on a biometric sensor.

Like the claim, the control information is characterized by the number of finger presses and the relative duration of each finger press.

The specification provides an example of this sort of control information where an administrator can begin an enrollment procedure for an ordinary user by using their finger to tap-tap-tap and hold a pattern on the biometric sensor.

Now, CPC points to this passage to say the claim is clearly directed to enrollment. But the series of entries that are being input as described in

this portion of the specification simply instructs the system to start an enrollment procedure. It is not the enrollment procedure itself.

Now, this sort of controllability would be useful, if not necessary, because many biometric sensors do not have user interfaces. They're typically just a button.

For these types of products, one could envision many different types of possible control signals that could be programmed to different series of entries.

For instance, at the top, you can begin an enrollment procedure by doing the tap-tap-tap-hold that's described in the specification. You could reset the biometric module if you tap it five times quickly.

In fact, the '705 patent specification extensively describes these sort of fob-like biometric sensors that users can carry around and broadcast wireless signals authenticating themselves.

And as you can see in Figure 2, the code entry module described there is a speaker and some lights and a biometric sensor with access to a processor and memory. There's no sort of user interface to control the interaction.

Now, the reason I described this

specification -- what's described in the specification is to give context to what's written in the claims.

When opining on infringement, CPC's expert Dr. Easttom does not identify a series of entries characterized by the number of entries and the duration of each entry like the control information that's described in the specification.

Instead, Dr. Easttom reorders the plain words of these claims so that the series is characterized by a number, and that is consistent with what's written in the claim.

But then for the duration, he says that each such entry is characterized by a duration. In other words, Dr. Easttom is changing what the duration of each entry is characterizing.

Now, the difference between these two interpretations is akin to Morse code, if we can use that as an example. Specifically, Morse code characterizes the letter V, for instance, as a tap-tap-tap-hold, which is like the enroll a new user described in the specification.

And so the letter V in Morse code is characterized by a number of entries, which is four, and the durations of each entry, tap-tap-tap-hold.

What Dr. Easttom is effectively opining

is that each entry just needs to be characterized by a duration. And in effect, he's looking at the individual entries rather than the overarching series.

In this example, Dr. Easttom would effectively be looking at the single tap of each entry or the hold of each entry rather than the V that's being characterized.

Now, Dr. Easttom does this because HMD does not characterize a series of entries according to a duration of each entry. Instead, CPC accuses HMD's enrollment process, where a user touches a small fingerprint sensor multiple times to provide the system a complete picture of the fingerprint.

So there's a number. But for the duration element, Dr. Easttom relies on the inherent duration that's required for the sensor to operate.

No sensor operates instantaneously, so in effect, every single entry will have some duration according to Dr. Easttom.

But Dr. Easttom never contends that the inherent duration of each entry characterizes this overarching series that's input into the accused devices as opposed to simply characterizing each reading.

Sometimes an entry is too short to

register and the system asks for another. But the critical question in the accused products is whether the system has obtained a good reading, a bad reading or sometimes a duplicate reading.

The enrollment process as a whole, though, is indifferent to the duration of each entry, and Dr. Easttom doesn't state any evidence suggesting otherwise.

Moreover, HMD's enrollment process can receive different series of entries, according to Dr. Easttom's view, and yet it produces the same output to enroll the user's fingerprint.

And that's because the accused products don't actually register any entries that are too short. It's just looking for enough good entries that the user can be enrolled in the system.

Now, besides saying that the duration is inherent to each reading, the only other evidence Dr. Easttom points to is some logs from the accused products. And these are obtained by running a certain software after plugging the phone in and the phone will output certain codes to the system.

Now, he points to this first entry, this fingerprint long press, as clear evidence that the accused products are monitoring the duration of each

entry.

But even if the accused products monitor the duration of each -- or monitor the duration of a press on the fingerprint sensor, CPC fails to show that this duration is in any way being used to characterize the series of entries, let alone during the enrollment process.

In fact, the fingerprint long press occurred well over a minute before the fingerprint enrollment process had even started. And Dr. Easttom never identifies any evidence that any sort of duration was being monitored during the enrollment process itself, which is what he is relying on for purposes of infringement.

So even if these logs show some sort of monitoring somewhere in the system, it's not for the enrollment process that he relies on.

Now, because CPC and Dr. Easttom fail to identify any evidence that the enrollment procedure of the accused products characterizes the overarching series by a duration of each entry, a summary judgment should be granted.

THE COURT: If we could go back to the first motion for partial summary judgment, if you could go back to that slide or...

10:21 MR. LEMBO: Yes, Your Honor.

10:21 THE COURT: So with respect, from your
10:21 perspective, to 8.3, 8V, and the G300, it's unclear to
10:22 me whether your argument is that -- for those three,
10:22 that the expert did actually articulate an opinion with
10:22 regard to each claim element.

10:22 MR. LEMBO: No, Your Honor. We moved for
10:22 partial summary judgment on the specific limitation of
10:22 a memory comprising a database of biometric signatures.

10:22 CPC cited some evidence, which HMD
10:22 disagrees with, but they admittedly cited some evidence
10:22 related to the FPC Architecture software that, at best,
10:22 would apply to [redacted].

10:22 For the rest of the products, they don't
10:22 cite any evidence for the database.

10:22 THE COURT: Okay. And then going back
10:22 maybe to the Daubert, then, is it -- is it you all's
10:22 position that there are no products for which they went
10:22 through and adequately opined on every element of every
10:22 claim that they're asserting?

10:23 MR. LEMBO: I believe that's correct,
10:23 Your Honor. Dr. Easttom doesn't perform an analysis
10:23 that checks every box for a single product or all of
10:23 the products.

10:23 THE COURT: Okay. That was what I

thought. Thank you.

A response to the summary judgment?

MS. GHAVIMI: Your Honor, I'd just like to address the last point that my colleague made where he said that Dr. Easttom did not cite to evidence to support every single claim limitation for every single product.

Well, if you look through his report, and I will give you every paragraph, he cites to Android open source code to prove that element.

So 1[b], it's 71. 1[c], it's 78. 1[d], it's 82. 1[e], it's 97. 1[f], it's 102. 1[h], it's 108. 1[i], it's 110. 1[j], it's 116. 1[k], it's 116. 1[l], it's 125. 1[m], it's 128. 1[n], it's 133. 1[g] is the transition, as well as 1[j].

And as I mentioned earlier with respect to the Daubert, Dr. Easttom did not give a matrix that went through and checked every single box for every product of every limitation, but he showed the evidence that is this same -- applicable to all of the products, meets every single claim limitation.

And I'd like to go to the series issue.

So Dr. Easttom, in his report at Paragraph 115, he clearly articulates his opinion that this element is infringed and that he is applying the

10:25 plain and ordinary meaning of the term.

10:25 And in his report, Paragraphs 115 to 123, he says, The series has to be characterized by both a number and a duration. HMD is saying he did not do that. But he affirmed that that's what he did. And he also confirmed this at -- upon being questioned at deposition.

10:25 Again, the fact that HMD disputes the evidence cited by Dr. Easttom is not appropriate for summary judgment. There are -- everything HMD has talked about are just disputes about whether this particular evidence demonstrates infringement. That's a material issue of genuine fact. Inappropriate for summary judgment.

10:26 And that's all I have.

10:26 THE COURT: Any rebuttal?

10:26 MR. LEMBO: Yes, Your Honor.

10:26 Your Honor, just a few quick points. In terms of the plain and ordinary meaning that Dr. Easttom had applied in Paragraph 115 of his report, that paragraph is what was shown on the screen -- and I could bring it up again, Your Honor -- but he clearly says he's applying the plain and ordinary meaning as characterizing a series of entries by the number and that each entry is characterized by a duration.

Now, Dr. Easttom might believe that that is the plain and ordinary meaning of this claim term, but it's not what the claim says. And that's the issue. And all the evidence is pointed to that understanding of the claim and not the words of the claim as it's written.

Now, CPC's counsel also pointed to Paragraph 122, which is a log file, as evidence -- I believe they pointed to 122 as evidence of this duration of each entry.

This is the exact one that was shown on the screen.

That the log that is relied upon was not part of the enrollment process that's accused of infringement, but occurred outside of that enrollment process.

And, finally, Your Honor, in terms of the general reference to the Android -- open source Android operating system, counsel had already spoken about this a bit, but one of the issues is that Dr. Easttom fails to identify the particular open source code that he cites throughout his report.

He just says these are all the same, but doesn't explain how. He doesn't provide a basis for it. And that isn't enough to survive summary judgment

here. For these reasons, summary judgment should be granted in HMD's favor.

THE COURT: Anything else from plaintiff?

MS. GHAVIMI: I would just like to say that what my colleague said, that Dr. Easttom provides no explanation with how the open source code meets the limitation, is incorrect. He provides a very detailed explanation with each paragraph that I cited to earlier as to how the source code meets the limitation.

Let me take -- I mentioned 78. So he says, Biometric sensors configured to receive a biometric signal in the accused products are evident from many source code files. He cites [redacted]. Okay?

He then goes on to say, It references FP sensor fingerprint hardware module. And that this code reports when a finger presses down or when the finger is lost, those functions support a biometric sensor configured to receive a biometric signal.

He doesn't just throw in cites to code files.

And the other point is that the -- at Paragraph 42 -- 41 of his report, he doesn't just cite one particular file as being present in each folder

produced by HMD. A, B, C, and D are the other code elements present in this [redacted] file.

And one thing to understand is that this file contains many sub folders, many -- it calls many functions. It operates -- it is the high-level code that implements all of the other types of functions which contains many more files that -- than just one particular file. And that's clear from how it works in the Android open source code. Thank you.

THE COURT: Yes, sir.

MR. LEMBO: One final point, Your Honor.

Your Honor, my understanding of the paragraphs cited by CPC's counsel, there's no indication in Dr. Easttom's report that those files are general open source files that are applicable to all accused products.

It's my understanding, Your Honor, that the files and folders referenced are directed to specific accused products. And that was one of the issues raised in the Daubert and in my past comments, was that there isn't an explanation as to how these apply broadly.

So there might be some files or folders referenced in Dr. Easttom's report, but it doesn't span the gambit of accused products in this case.

Thank you.

THE COURT: Anything else from plaintiff?

MS. GHAVIMI: Nothing further, Your Honor.

THE COURT: Okay. I'm going to take a short break and then I'll come back.

THE BAILIFF: All rise.

(Recess taken.)

THE BAILIFF: All rise.

THE COURT: Thank you. You may be seated.

The Court is going to grant the Daubert motion.

The Court is also going to grant the motion for partial summary judgment. We had a discussion in the back. I think the impact of my holding on the Daubert motion is likely to lead to a summary judgment, a grant of an entire summary judgment, but we'll have to figure that out in the back.

At any rate, the granting of the Daubert would mean there would be no evidence at trial to prove infringement. And so we will get a written order out setting forth the reasons, but I'm going to take the trial off of the trial schedule.

So is there anything else we need to take up?

MS. GHAVIMI: Your Honor, if I could just clarify something.

(Clarification by Reporter.)

MS. GHAVIMI: The relief sought in the Daubert motion was exclusion of -- well, on Page 6, 44, 55 to 60, 72, 73, 84 to 86, 98, 100, 101, 126 and 129. The paragraphs I cited where Dr. Easttom refers to the Android open source code are not within those paragraphs that they sought to be excluded.

So they haven't challenged the sufficiency of the evidence Dr. Easttom cites to the Android open source code. And they should be held to that.

And in regards to the claim constructions, any opinions based on his misconstructions should be excluded under Daubert. But he is -- that does not preclude him from testifying about infringement at trial.

So I would just like to clarify that you're granting the motion to the extent the relief sought by HMD.

THE COURT: Here's what I'm going to do. I'm taking the trial off the docket. We'll get an

10:48 order out. And if there's anything that -- after we
10:48 see all the parameters of what we've granted, if
10:48 there's anything left to be tried, then we'll put it
10:48 back on the docket.

10:48 MS. GHAVIMI: Thank you, Your Honor.

10:48 THE BAILIFF: All rise.

10:48 (Hearing adjourned.)

UNITED STATES DISTRICT COURT )
WESTERN DISTRICT OF TEXAS )

I, Kristie M. Davis, Official Court Reporter for the United States District Court, Western District of Texas, do certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

I certify that the transcript fees and format comply with those prescribed by the Court and Judicial Conference of the United States.

Certified to by me this 6th day of June 2023.

10:48

*/s/ Kristie M. Davis*
KRISTIE M. DAVIS
Official Court Reporter
800 Franklin Avenue
Waco, Texas 76701
(254) 340-6114
kmdaviscsr@yahoo.com